**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Timothy L. MASTERS, Defendant– Appellant.**

**No. 99CA0896.**

Colorado Court of Appeals, Div. IV.

Feb. 15, 2001.

Rehearing Denied March 22, 2001.

Ken Salazar, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Denver, CO, for Plaintiff–Appellee.

Fischer & Fischer, LLP, Erik G. Fischer, Fort Collins, CO, for Defendant–Appellant.

Opinion by Judge CASEBOLT.

Defendant, Timothy L. Masters, appeals the judgment of conviction entered upon a jury verdict finding him guilty of first degree murder. We affirm.

Late one night in 1987, as the victim walked along a road near a field adjacent to defendant's home, she was subjected to an apparent surprise attack and was stabbed in the back by a person wielding a knife with a five-inch blade. She was dragged more than a hundred feet into the open field and was found by a passerby the next morning. When found, the body had been partially disrobed and had been sexually mutilated with a very sharp instrument, possibly a scalpel. Scratches were evident on one side of her face, and a pool of blood surrounded her body.

During the investigation that morning, police contacted defendant's father at home. Since defendant's bedroom faced the field, and the victim's body could be seen from his bedroom window, the police contacted the fifteen-year-old defendant at his high school concerning the possibility that he had seen the body on his way to school. When the police detective first spoke to defendant and asked him if he knew why the detective was there, defendant nodded and stated that "it had been bothering him" and that he thought he had seen a body as he was walking to catch the bus. He explained that he did not report it because he believed the body to be a mannequin.

Because of his failure immediately to report the victim's body, defendant became a suspect. A consensual search of defendant's bedroom revealed a large collection of survival knives with long blades, one containing a scalpel in its handle, a fillet knife, a machete, and a ninja sword, as well as a suitcase

containing pornographic depictions of female anatomy and a large number of drawings and narratives.

These latter written materials had been created by defendant and depicted surprise attacks, gruesome death scenes, and scenes of violence and sex. Some of the drawings depicted persons with scratches across their cheeks with pools of blood surrounding them, and there were scenes of torture, cutting of body parts, and depictions of survival knives with long blades.

A consensual search of defendant's locker and backpack revealed additional drawings and narratives, including two maps of the field and surrounding area and a drawing of a body being dragged by another person.

The murder had taken place almost exactly four years following the death of defendant's mother. Both the victim and the mother had wavy red hair. Defendant did not know the victim, but admitted that he might have seen her around the neighborhood; they lived in the same area and shopped at the same Albertson's supermarket.

During an interrogation following a *Miranda* advisement and waiver, a detective stated to defendant that stabbing someone with a serrated-edged knife would cause a lot of damage. Defendant replied, "Yeah, but it would be tough to pull it back out."

Defendant also had stated that the victim was wearing pink shoes. The victim's socks were in fact pink but could not be seen at the crime scene because of the positioning of the body and the arrangement of the clothing.

The detective asked defendant if he had any suggestions concerning investigation of the case, and defendant said to check the ditch under a particular bridge. Six months later, a survival knife with a serrated edge was found in the ditch very close to the bridge. The coroner opined at trial that the serration on that knife could account for the irregularity in the stab wound in the victim's back that he had observed upon autopsy.

The police investigation did not find any blood matching the victim's on any of defendant's clothing or property. Also, there was no fiber evidence that would link defendant to the murder, and there was no property of the victim or any severed body parts found in defendant's possession. As a result, no charges were filed, and the murder remained unsolved.

Ten years later, the police department consulted a forensic psychologist with expertise in the area of "sexual homicides." The psychologist reviewed the drawings and narratives that defendant had produced, together with the other evidence in the case, and prepared reports containing his opinion. He opined that defendant had killed the victim and, by doing so, had symbolically killed his own mother.

Based on this and the other evidence, defendant was arrested and charged with first degree murder in 1998. The police obtained a search warrant and seized additional drawings and narratives defendant had created following the crime.

By a motion *in limine*, defendant sought to bar the psychologist's testimony and to preclude admission of the drawings and narratives under CRE 404(b). At a hearing on the motion, the psychologist testified at length regarding research in the area of sexual homicide.

The psychologist stated that a sexual homicide, *i.e.*, one in which there is sexual activity by the perpetrator, is generally preceded by a triggering event in the emotional life of the perpetrator. He explained that fantasy is the motivation behind sexual homicides and that a perpetrator's fantasies become a rehearsal for his commission of the crime. He described in detail five different categories of such fantasies and opined how defendant's drawings and narratives fit into each of the five categories.

He opined that the materials reflected a preference for surprise attack, rather than a ruse or seduction; that the materials exhibited "piquerism," *i.e.*, stabbing and slicing as the means of sexually penetrating the victim's body, as demonstrated by defendant's preoccupation with knives and cutting; that the victim resembled defendant's mother in age and hair color, and the killing occurred almost exactly four years after the defendant's mother had died; that the victim was a stranger or, at most, a casual acquaintance;

and that defendant perceived himself as a warrior character without empathy or feeling who engaged, through fictional narratives and pictures, in a variety of killings.

The court admitted the drawings and narratives under CRE 404(b), but limited the expert's testimony. The court permitted the psychologist to testify about the concept of sexual homicide and the associated concepts of triggering events, fantasy, and rehearsal fantasy, and allowed him to describe evidence that fit its characteristics. The expert, however, was precluded from giving an opinion that this was a sexual homicide, that defendant fit the characteristics of a sexual homicide perpetrator, that defendant committed the crime, or that any drawing or narrative was evidence that defendant had committed this crime. He was also permitted to testify hypothetically concerning the type of event that might be a trigger for a sexual homicide and to give an opinion that a drawing or narrative defendant had created was an example of one of the categories noted.

Among the other testimony presented at trial was that of defendant's high school teacher and a counselor, who were permitted to testify concerning an incident at school that had happened approximately one month before the victim's murder. The prosecution theorized that this incident was a triggering event for the murder.

Trial resulted in the conviction at issue here.

## I.

Before the crime occurred, defendant had created over a thousand pages of drawings and narratives. The trial court permitted the prosecution to introduce the drawings and narratives under CRE 404(b) for the purpose of showing defendant's intent, motive, knowledge, preparation, planning, identification, and opportunity to commit the crime. Defendant contends the court erred in so ruling. We disagree.

Besides being admitted as exhibits, approximately 90 of the drawings and narratives were introduced during trial through a police officer's testimony and slide projections. The officer described individual narratives or drawings and how they referenced use of survival knives, dragging of bodies, cutting upon bodies, blood pools, scratching of faces, violence against women, and the pairing of sex and violence.

A trial court is vested with substantial discretion when determining whether to admit evidence of other acts, and its ruling will be disturbed only if it is manifestly arbitrary, unreasonable, or unfair. *See Douglas v. People,* 969 P.2d 1201 (Colo.1998); *People v. Copeland,* 976 P.2d 334 (Colo.App.1998), *aff'd,* 2 P.3d 1283 (Colo.2000).

For evidence of other crimes, wrongs, or acts to be admissible under CRE 404(b), the evidence must meet the criteria set forth in *People v. Spoto,* 795 P.2d 1314 (Colo.1990). First, the evidence must relate to a material fact, *i.e.,* it must be of consequence to the determination of the action. Second, the evidence must be logically relevant by tending to make the existence of the material fact more or less probable than it would be without the evidence. Third, the evidence must have relevance independent of the inference that the defendant acted in conformity with a bad character. Finally, the probative value of the evidence must not be substantially outweighed by the risk of unfair prejudice to the defendant.

In reviewing the admission of other act evidence, we must assume the maximum probative value a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected from its introduction. *People v. Nuanez,* 973 P.2d 1260 (Colo.1999).

Applying those criteria here, we observe two bases for a finding of logical relevance. First, the narratives and drawings are relevant to defendant's motive, intent, knowledge, opportunity, and plan to commit the crime. For example, the references to survival knives in defendant's narratives and drawings were logically relevant to show that defendant had sufficient knowledge about the use of such knives. Similarly, defendant's drawings of maps of the area in which the crime occurred demonstrate his knowledge of

the area. They are also probative of a plan and opportunity to commit the crime.

Further, defendant's numerous narratives and drawings of people and animals being stabbed in a surprise fashion, victims with distinctive scratches on their faces, and bodies being dragged, mutilated, and surrounded by pools of blood are sufficiently similar to the manner in which the victim was killed so as to be logically relevant to defendant's motive, intent, and plan to commit the crime. *See generally* E. Imwinkelried, *Uncharged Misconduct Evidence* § 3 (rev. ed.1999).

In addition, defendant's drawings of persons committing suicide by placing a gun to the head were relevant because defendant had told a detective that "if I did this, I'd blow my brains out." The drawings also demonstrate a hatred of or anger directed against women, providing evidence of motive. *See Black's Law Dictionary* 1014 (7th ed.1999) (motive is "an inducement, or that which leads or tempts the mind to indulge a criminal act").

■ It is true, as defendant asserts, that there is no single drawing or narrative depicting a woman being stabbed in the back, nor is there any description or illustration of sexual mutilation that matched the injuries to the victim. However, there are drawings depicting attacks upon genitalia, and a drawing that could be interpreted as a knife cutting a vaginal opening. A prior act does not need to be similar in every respect to be admissible. *See People v. Garner*, 806 P.2d 366 (Colo.1991); *People v. McKibben*, 862 P.2d 991 (Colo.App.1993).

Second, defendant's drawings and narratives are logically relevant to motive and intent when considered in the context of the prosecution's theory of the crime. Pursuant to that theory, perpetrators of sexual homicides often first rehearse their crimes in fantasies; hence, the drawings and narratives would be probative of defendant's motive and intent. *See People v. Phillips*, 122 Cal.App.3d 69, 175 Cal.Rptr. 703 (1981) (upholding admission of theory of "Munchausen's syndrome by proxy" to show defendant's motive in first degree murder of daughter even though defendant did not put her state of mind in issue).

Defendant asserts that evidence of prior acts to show the element of intent in a crime is material and relevant *only* when a defendant raises lack of intent as a defense. We reject this contention.

■ When, as here, intent is a material element that the prosecution must prove, then prior act evidence may indeed be admissible to show such intent. This is especially so where the prosecution has the added burden of showing deliberation. *See People v. Willner*, 879 P.2d 19 (Colo.1994) (holding intent to be a material issue since it bore on issues of self-defense and premeditation in a first degree murder case); *People v. Vialpando* 954 P.2d 617 (Colo.App.1997) (upholding the admission of defendant's prior acts to show premeditated intent to kill the victim); E. Imwinkelried, *supra*, §§ 5:10 & 5:17.

Accordingly, defendant's narratives and drawings are logically relevant under the second part of the *Spoto* analysis.

Further, since intent to kill after deliberation is an element of the crime here, evidence that tends to prove this element is relevant independent of the inference of bad character. In other words, the evidence does something else independent from and beyond showing a general propensity to commit a crime. *See People v. Snyder*, 874 P.2d 1076 (Colo.1994) (*Spoto* does not demand the absence of an inference that there is bad character and action taken in conformity therewith, but merely proof that the evidence is logically relevant independent of that inference). Thus, defendant's drawings and narratives comport with the third prong of the *Spoto* test.

■ In regard to whether the probative value of the evidence is outweighed by the risk of unfair prejudice, we recognize that there was indeed danger that the jury would use the evidence to conclude that defendant in fact killed the victim in conformity with his character, rather than solely as evidence of his intent, motive, knowledge, plan, or opportunity to do so. However, assuming the maximum probative value of the narratives and drawings, and the minimum prejudice reasonably to be expected, and according

substantial deference to the trial court's decision on this issue, as we must, we conclude that the risk of prejudice here does not substantially outweigh the probative value of the evidence. *See People v. Nuanez, supra.*

Further, defense counsel specifically refused the trial court's offer of a limiting instruction concerning the use of this evidence at the close of trial, and did not request such an instruction when the evidence was introduced. *See People v. Honey,* 198 Colo. 64, 596 P.2d 751 (1979); *Stull v. People,* 140 Colo. 278, 344 P.2d 455 (1959); *COLJI–Crim.* No. 4:02 (1983). *Cf. People v. Shepard,* 989 P.2d 183 (Colo.App.1999) (upholding admission of evidence where one limiting instruction was given and defense counsel refused another).

Consequently, we perceive no basis for reversal in the admission of the drawings and narratives defendant had produced before the crime.

## II.

Defendant also asserts the trial court erred in admitting into evidence the drawings and narratives seized in 1998. Again, we disagree.

In consultations following defendant's arrest, the forensic psychologist told police that, in accordance with prevailing sexual homicide theory, defendant was likely to have continued creating narratives and drawings of violent sexual fantasies after committing the crime. Based on this information, the police officer prepared affidavits to obtain search warrants for these items at defendant's homes.

During the searches, police found, among other things, six notebooks of narratives and drawings by defendant, parts of which were ultimately introduced at trial.

### A.

Defendant's initial challenge to this evidence is that the trial court erred in concluding that the search warrants were based upon probable cause. We disagree.

■ When a reviewing court examines a search warrant to determine its validity, the magistrate's probable cause determination is given great deference and is not reviewed *de novo.* A reviewing court should assess whether the affidavit provided the magistrate with a substantial basis for concluding probable cause existed. *People v. Randolph,* 4 P.3d 477 (Colo.2000). Also, any doubts must be resolved in favor of a magistrate's determination of probable cause. *People v. Fortune,* 930 P.2d 1341 (Colo.1997).

■ Probable cause for a search warrant exists when the affidavit in support of the warrant alleges sufficient facts to warrant a person of reasonable caution to believe that contraband or evidence of criminal activity is located at the place to be searched. *Henderson v. People,* 879 P.2d 383 (Colo. 1994).

■ Here, as had occurred in the initial investigation, the police specifically sought drawings, narratives, and journals of defendant located at his home. The forensic psychologist opined that defendant would have continued to produce evidence of violent sexual fantasies after the crime. Such evidence would therefore corroborate the psychologist's theory and, ultimately, the prosecution's trial theory.

Accordingly, there was a reasonable indication that the items sought would be found in defendant's home. If found, they would be probative of an element of defendant's guilt. *See Kennard v. People,* 171 Colo. 194, 465 P.2d 509 (1970) (concerning the issue of intent and guilty knowledge, what one does after commission of a criminal act may be as revealing as that which he or she has done before). We therefore reject defendant's contention that there was no probable cause for issuance of the warrants.

We further reject defendant's related contention that the information that formed the basis of the warrants was stale. Contrary to defendant's assertion, the police were seeking evidence of defendant's continued violent sexual fantasies to corroborate the psychologist's recent, not stale, theory of the case. *See People v. Randolph, supra.*

### B.

■ As it had relative to the 1987 evidence, the prosecution offered defendant's post-crime drawings and narratives to show defendant's motive, intent, identity, and knowledge in committing the crime. And, defendant again argues that the drawings and narratives constitute inadmissible character evidence. We perceive no error in their admission.

Pursuant to *People v. Spoto, supra*, we first analyze this evidence for logical relevance. The prosecution expert's testimony that the perpetrator of a sexual homicide would continue to have violent sexual fantasies and dwell on events related to the crime long after its commission provides a context for such relevance. For instance, defendant's graphic stories concerning a "hit man," as well as the writing regarding the stabbing of a puppy, demonstrated his continued obsession with violent fantasies. Also, an exhibit showing a portion of a calendar with the date of the murder circled and the vignette regarding a "moonlit walk to Albertson's" supermarket reasonably could be interpreted to correspond to events on the night of the victim's death.

Further, in supporting the prosecution's theory, this evidence would help demonstrate defendant's guilty knowledge. *See People v. Harris*, 892 P.2d 378 (Colo.App.1994) (defendant's knowledge of companion's prior robbery and suspicious activity was relevant to whether defendant knew that companion intended to commit the crimes charged).

Concerning independent relevance, such evidence was relevant, not to show defendant's bad character, but that he had acted with the guilty knowledge of a perpetrator of a sexual homicide. *See Callis v. People*, 692 P.2d 1045 (Colo.1984) (giving a false name to an arresting officer may be probative of an intent to avoid detection or apprehension and thus could be admissible as evidence of guilty knowledge); *People v. Lamirato*, 180 Colo. 250, 504 P.2d 661 (1972) (affirming admission of defendant's subsequent thefts of same type of item to show plan, scheme, design, or guilty knowledge).

Concerning prejudice, we agree there is a risk that the jury would improperly use this evidence. However, again assuming the maximum probative value of the narratives and drawings and the minimum unfair prejudice reasonably to be expected, together with the substantial deference afforded to the trial court's decision on this issue, we conclude the risk of prejudice here is not undue. *See People v. Nuanez, supra*. We again note counsel's apparently strategic decision to reject a limiting instruction concerning this evidence.

Consequently, we find no error in the admission of defendant's post-crime drawings and narratives.

### III.

■ Defendant also asserts that the trial court improperly admitted pornographic pictures found in his home both in 1987 and 1998. However, the record demonstrates that only three magazine photos, all from 1987, were admitted. Hence, we evaluate the admissibility of these three photos only, and we find no error in their admission.

In general, all relevant evidence is admissible. CRE 402. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable. CRE 401.

In opening statements, defense counsel had characterized defendant as a "shy, quiet introvert, [an] immature child." Given this characterization and defendant's age, an issue for determination was how a fifteen-year-old boy could have possessed the knowledge required to have cut out the victim's genitalia. Thus, the photos, which depicted women displaying their genitalia, made it more likely that defendant had the knowledge requisite to perpetrate the mutilation. Hence, the photos were relevant.

To the extent that defendant asserts such evidence is inadmissible under CRE 404(b), we also reject that contention. The evidence relates to a material fact and is logically relevant. Further, since the admission of the photos goes directly to the issue of whether defendant possessed adequate knowledge to

mutilate the victim, they are relevant independent of the inference that defendant had a bad character.

■ Concerning prejudice, it is within the discretion of the trial court to decide whether otherwise relevant photographs are unnecessarily inflammatory or unfairly prejudicial to defendant, and the court's decision will be reversed only upon a showing of an abuse of that discretion. *People v. Viduya*, 703 P.2d 1281 (Colo.1985).

■ While we recognize that the photos admitted into evidence here were graphic, we cannot conclude that they would have so inflamed the jury as to pose an undue risk of prejudice. *See People v. Randall*, 711 P.2d 689 (Colo.1985) (admission of two magazines containing sexually explicit photographs held proper); *People v. Aldrich*, 849 P.2d 821 (Colo.App.1992) (no reversible error in admitting significant volume of sexually explicit material).

Moreover, we also note that the court exercised its discretion to exclude additional items of pornography offered by the prosecution.

Consequently, we perceive no abuse of discretion in the trial court's admission of the photos.

## IV.

■ Defendant also contends that testimony concerning an incident that had occurred at his school one month before the murder constituted impermissible character evidence under CRE 404(b) and, thus, should not have been admitted. Again, we disagree.

The prosecution's expert testified that the rehearsal fantasies of the perpetrator of a sexual homicide are followed by a precipitating event or a trigger mechanism that compels the person to act upon the fantasies. The expert gave several examples of possible triggering mechanisms, including a conflict with adult women in positions of authority in a school setting.

Defendant had had an altercation with a teacher and a session with a counselor. The trial court ruled that the prosecution expert could not testify regarding this incident;

however, the teacher and counselor themselves could relay what had occurred.

We note initially that the teacher testified that she found defendant's drawings to be frightening and scary. While defendant complains concerning admission of this testimony and the lack of a limiting instruction, he made no contemporaneous objection to this evidence at trial, nor did he request a limiting instruction. He did register a "continuing objection" to "everything this witness is going to say"; however, that objection was made in the context of his contention that CRE 404(b) precluded admission of the evidence. Moreover, defendant does not assert on appeal that its admission was plain error. Hence, we will not separately address the admission of this portion of the testimony. *See Blades v. DaFoe*, 704 P.2d 317 (Colo. 1985) (to preserve the issue on appeal, the grounds upon which the objection is made must be reasonably apparent); *Righi v. People* 145 Colo. 457, 359 P.2d 656 (1961) (failure to object to trial court's ruling constitutes waiver of objection).

The teacher described an incident in which she confiscated a military manual defendant had brought to class, his angry reaction when she refused to return it to him after class, her consequent feelings of fear, and her taking him to the school counselor's office. The counselor then testified as to what transpired during her counseling session with defendant.

Again considering the logical relevance factor of the *Spoto* analysis, we conclude that the testimony of the teacher and the counselor is relevant, because it demonstrates that in the weeks leading up to the crime defendant exhibited increased signs of anger and aggression. Thus, it is probative of intent and deliberation.

This testimony is also relevant independently of the inference of bad character because defendant's intent and motive were directly at issue.

Finally, we do not perceive that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Defendant complains that the trial court failed to give a limiting instruction for

this testimony; however, again, defendant did not ask for one contemporaneously and refused one at the close of the trial.

For these reasons, we reject defendant's contention that the trial court erred in admitting this testimony.

## V.

Defendant contends the trial court erred in admitting the testimony of the prosecution's expert to explain to the jury the relevance of the drawings, narratives, pornography, and the testimony of defendant's teacher and counselor. We disagree.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." CRE 702. *See Salcedo v. People*, 999 P.2d 833 (Colo.2000).

■ Under CRE 702, a court must first consider whether the substance of the proffered testimony will be helpful to the fact finder. The court must then decide whether the witness providing such information is competent to render an expert opinion on the subject in question. Taken together, these two prongs ask a familiar question: Can a jury receive appreciable help on the subject from this person? *See Brooks v. People*, 975 P.2d 1105 (Colo.1999).

■ Trial courts possess broad discretion to allow or prohibit testimony by expert witnesses in criminal cases. *People v. Williams*, 790 P.2d 796 (Colo.1990). The decision to admit expert testimony will not be overturned absent an abuse of discretion. *People v. Fasy*, 829 P.2d 1314 (Colo.1992).

To establish that a court has abused its discretion, it must appear that the court's choice of a particular course of action was manifestly arbitrary, unreasonable, or unfair. *People v. Ibarra*, 849 P.2d 33 (Colo.1993).

## A.

■ Defendant first contends there was no need for expert testimony on the subject of sexual homicide in this case because lay persons are sufficiently able to understand such crimes without the help of an expert. We disagree.

■ In determining this issue, we engage in a common-sense inquiry: whether an untrained lay person would be qualified to determine a particular issue "intelligently and to the best possible degree without enlightenment from those having a specialized understanding of the subject involved in the dispute." *See Lanari v. People*, 827 P.2d 495, 502 (Colo.1992).

■ In considering whether expert testimony will assist the trier of fact, the trial court must consider: (1) the proposed testimony in light of the elements of the crime; (2) the nature and extent of other evidence in the case; (3) the expertise of the proposed witness; (4) the sufficiency and extent of the foundational evidence upon which the expert witness' ultimate opinion is to be based; and (5) the scope and content of the proposed expert opinion itself. *Lanari v. People, supra.*

### i.

Here, since defendant was charged with first degree murder, the prosecution had the burden to prove intent and deliberation beyond a reasonable doubt. *See Cooper v. People*, 973 P.2d 1234 (Colo.1999). Accordingly, defendant's mental state and his thought processes at the time of the murder were at issue.

The expert's testimony on the nature of sexual homicide and the physical evidence in this case was helpful to the jury to understand the general nature of the crime and to evaluate whether defendant had the requisite motive and intent. This, in turn, would have helped the jury determine whether defendant had formed the necessary *mens rea* to commit the crime. *See Hendershott v. People*, 653 P.2d 385 (Colo.1982) (the reliability and usefulness of psychiatric opinion evidence has long been recognized in a variety of proceedings involving the mental state of an accused).

#### ii.

■ Concerning other evidence in the case, the trial court should decide whether there is sufficient evidence to support the introduction of the opinions of the expert to determine a fact in issue, and it should determine whether the opinions will assist the trier of fact in understanding the other evidence in the case. *See Lanari v. People, supra.*

Here, as detailed above, there is sufficient evidence to support the introduction of the expert's testimony, and his testimony provided insight and connection between the evidence presented and defendant. The expert's testimony on the nature of sexual homicides and the perpetrators of such crimes would have helped the jury understand the other evidence and the relation of the other evidence to defendant's motive, intent, opportunity, and knowledge. *See Stevens v. People,* 796 P.2d 946 (Colo.1990) (affirming propriety of psychiatric testimony of symptoms of child abuse given evidence as a whole).

#### iii.

Defendant does not challenge the expertise of the prosecution's witness. Nevertheless, we observe that the expert's credentials and experience support the court's ruling that the witness was an expert in the field of forensic psychology and, specifically, in the area of sexual homicide.

#### iv.

We also conclude there is sufficient foundational evidence upon which the expert's opinion could be based.

At the hearing on defendant's motion *in limine* to exclude this evidence, the prosecution's expert defined sexual homicide and testified that the concept is widely accepted among forensic psychologists and psychiatrists. He described the history of research in the field and reported several studies of such perpetrators and the correlation between their fantasies and the homicides committed.

At trial, some, but not all, of this foundational evidence was again presented. While we recognize that the research and theories upon which the prosecution expert relied are relatively new and not universally accepted, they are sufficiently recognized, based on this record, such that we will not disturb the trial court's decision that the foundational evidence was adequate to make the expert's testimony helpful to the jury.

Further, defendant presented his own expert who pointed out the weaknesses in the prosecution expert's theories and opinions. In addition, the court instructed the jury both at the start of each expert's testimony and at the end of the trial that the jurors were to weigh the experts' testimony as they would that of any other witnesses. Thus, the risk of unfair prejudice, confusion of the issues, misleading the jury, or the creation of undue delay, waste of time, or needless presentation of cumulative evidence was minimal.

Hence, the trial court acted within its discretion in finding that the foundational testimony was sufficient.

#### v.

The record also shows the trial court severely limited the scope and extent of the prosecution expert's testimony.

In his written reports, the expert had concluded that the homicide at issue here was a sexual homicide. He had opined that defendant exhibited the psychological characteristics of a perpetrator of a sexual homicide.

After evaluating what testimony would be helpful to the jury, the trial court prohibited the prosecution expert from testifying as to many of his opinions. The expert was permitted to testify only concerning the elements of a sexual homicide and the characteristics of perpetrators of sexual homicide, and to identify individual writings and drawings created by defendant that conformed to those characteristics, in addition to the foundational testimony previously described.

The expert did not opine that any piece of physical evidence was evidence that defendant committed the crime. Nor did the expert testify that defendant fit any characteristics of a perpetrator of a sexual homicide. Finally, the expert also offered no opinion on

the ultimate issue of whether defendant committed the homicide.

Consequently, the nature and scope of the expert's testimony was reasonably narrow and helpful to the jury.

In sum, our review of the record reveals adequate support for the court's ruling that the expert's testimony would be helpful to the jury. In our view, an untrained lay person would not be qualified to determine the particular issues in this case intelligently and to the best possible degree without enlightenment from those having a specialized understanding of the subject involved in the dispute. Hence, we reject defendant's contention that the testimony should have been excluded because the jury could easily understand the nature of the crime. *See United States v. Meeks*, 35 M.J. 64 (CMA 1992) (F.B.I. crime scene expert's testimony admissible to analyze scene in light of his knowledge regarding other murder cases; inferences regarding perpetrator that agent drew from scene also admissible, but expert prohibited from giving opinion regarding individual perpetrator); *People v. Drake*, 129 A.D.2d 963, 514 N.Y.S.2d 280 (1987) (upholding admissibility of expert psychological testimony concerning pathological condition of piquerism; subject concerned a behavioral phenomenon not within the common knowledge of the average juror and required professional knowledge; fact that testimony tended to prove intent did not render it inadmissible); *but cf. State v. Person*, 20 Conn.App. 115, 564 A.2d 626 (1989) (trial court did not err in prohibiting defendant from establishing, through testimony of a psychiatrist and psychologist, that he did not fit the profile of a pedophile, because of insufficient reliability); *State v. Fortin*, 162 N.J. 517, 745 A.2d 509 (2000) (F.B.I. expert in analysis of modus operandi and ritualistic crimes could not testify that two unique crimes were committed by same person using "linkage analysis" because not sufficiently reliable); *State v. Cavallo*, 88 N.J. 508, 443 A.2d 1020 (1982) (precluding expert testimony offered by defendant that he did not have the psychological traits of a rapist because evidence not scientifically reliable).

## B.

■ Defendant also asserts that the expert's testimony was inadmissible because it constituted impermissible psychological profiling. We disagree.

The use of psychological theories, syndromes, profiles, and comparative expert testimony in criminal cases has been significantly debated. Opinions of commentators vary as to when and how such evidence should be used. *See* Faigman, *To Have and Have Not: Assessing the Value of Social Science to the Law as Science and Policy*, 38 Emory L.J. 1005 (1989); McCord, *Syndromes, Profiles and Other Mental Exotica: A New Approach to Admissibility of Nontraditional Psychological Evidence in Criminal Cases*, 66 Or. L.Rev. 19 (1987); Mosteller, *Syndromes and Politics in Criminal Trials and Evidence Law*, 46 Duke L.J. 461 (1996); Raeder, *The Better Way: The Role of Batterers' Profiles and Expert "Social Framework" Background in Cases Implicating Domestic Violence*, 68 U. Colo. L.Rev. 147 (1997); Raeder, *People v. Simpson: Perspectives on the Implications for the Criminal Justice System: The Admissibility of Prior Acts of Domestic Violence: Simpson and Beyond*, 69 S. Cal. L.Rev. 1463 (1996); Slobogin, *Psychiatric Evidence in Criminal Trials: To Junk or Not to Junk?*, 40 Wm. & Mary L.Rev. 1 (1998); Ingram, Note, *If the Profile Fits: Admitting Criminal Psychological Profiles into Evidence in Criminal Trials*, 54 Wash. U.J. Urb. & Contemp. L. 239 (1998).

Courts have likewise reached differing conclusions. *Compare Haakanson v. State*, 760 P.2d 1030 (Alaska App.1988) (child sexual abuser profile precluded by Alaska Evidence Rule 404(a)); *People v.. Walkey*, 177 Cal. App.3d 268, 223 Cal.Rptr. 132 (1986) (prosecution could not introduce evidence to show defendant has the characteristics of a typical battering parent); *Sanders v. State*, 251 Ga. 70, 303 S.E.2d 13 (1983) (state cannot introduce evidence of battering parent syndrome); *Commonwealth v. Day*, 409 Mass. 719, 569 N.E.2d 397 (1991) (child battering profile inadmissible); *State v. Loebach*, 310 N.W.2d 58 (Minn.1981) (evidence that suggests defendant fits within the profile of a battering parent is character evidence that cannot be

admitted unless defendant first places character in issue), *with United States v. Cross,* 928 F.2d 1030 (11th Cir.1991) (upholding admission of testimony by F.B.I. agent concerning characteristics of pedophiles); *United States v. White,* 890 F.2d 1012 (8th Cir. 1989) (predictive profiles are inherently prejudicial; but distinguishing challenged expert testimony admissible as modus operandi evidence); *Pennell v. State,* 602 A.2d 48 (Del. 1991) (expert could review three murders for which defendant was charged and express opinion that they were all committed by same person); *State v. Swallow,* 350 N.W.2d 606 (S.D.1984) (admission of expert testimony explaining pedophilia to jury upheld).

In sum, the essential rationale for excluding profile evidence is that it constitutes improper character evidence. Courts that have admitted such evidence generally have done so by finding that the proffered evidence fits within one of the general exceptions codified by the analogue of CRE 404(b).

The supreme court has not directly addressed the type of evidence offered here. However, in *Salcedo v. People, supra,* the court analyzed the admissibility of drug courier profiles. It noted that profiling involves applying a set of characteristics to identify individuals who are in the process of committing a crime. It is often used in drug courier cases, where an informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics is used to identify random persons as perpetrators of crime. The court concluded that such evidence was inadmissible.

Initially, we acknowledge that there are similarities between the psychological analysis the expert proffered here and the criminal profile evidence that defendant contends is inadmissible. We observe that the use at trial of psychological "theories," "syndromes," and "profiles" involves correlating the acts or state of mind of a party or witness with some diagnostic or predictive ideas of behavior. *See McCormick on Evidence* § 206 (J. Strong 5th ed.1999) (noting that all people evaluate information in relation to "profiles").

However, there are fundamental differences between the psychological theories and analysis offered here and impermissible profiling. Here, a psychological theory and analysis, founded on research and study, was used to provide a framework for the crime at issue and to examine and give context for a defendant's past acts that were independently admissible under CRE 404(b). *See State v. Fortin, supra* (expert in criminal investigative techniques would be qualified to discuss similarities between crimes without drawing conclusions about the guilt or innocence of the defendant; such testimony can be of assistance to court and jury on the issue of admission and understanding of other crime evidence); Monahan & Walker, *Social Frameworks: A New Use of Social Science in Law,* 73 Va. L.Rev. 559 (1987) (describing the value of social framework evidence in trials). Essentially, once other crime evidence is admitted for a proper purpose under CRE 404(b), *a fortiori* it is not prohibited character evidence under CRE 404(a), nor impermissible profile evidence.

Here, the expert compared crime scene evidence to studies and characteristics found in sexual homicides; discussed the application of modus operandi in sexual homicides; described why sexual homicide perpetrators mutilate the body of their victims and opined concerning the killing involved here; discussed triggering events in sexual homicides; and discussed the role of rehearsal fantasy in sexual homicide, examined the notebooks produced by defendant, and opined about how they reflected such fantasies. Such framework evidence, when coupled with examination and explanation of the specific instances of prior conduct admissible under CRE 404(b), was not improper on this record.

Furthermore, Colorado courts have been called upon to evaluate the propriety of using expert psychological and psychiatric testimony in numerous cases, and have generally admitted it if it complies with the applicable evidentiary rules. *See People v. Fasy, supra* (permitting expert testimony to assist the jury in understanding a child sexual assault victim's post-assault behavior); *Campbell v. People,* 814 P.2d 1 (Colo.1991) (concluding that, although inadmissible in that case, expert testimony regarding eyewitness identifi-

cation may be admissible if it comports with CRE 403 and 702); *People v. Hampton,* 746 P.2d 947 (Colo.1987) (allowing expert testimony on rape trauma syndrome to corroborate victim's testimony and explain her delay in reporting); *Hendershott v. People, supra* (affirming the admission of expert testimony of a mental condition to refute defendant's culpability); *Ferrin v. People,* 164 Colo. 130, 433 P.2d 108 (1967) (determining that expert opinion evidence may be admissible to assist the jury in evaluating a particular defendant's conduct in light of the heat of passion manslaughter statute); *People v. Lafferty,* 9 P.3d 1132 (Colo.App.1999) (affirming the admission of expert testimony regarding victims' recantations pursuant to the "cycle of violence" associated with domestic violence); *People v. Koon,* 724 P.2d 1367 (Colo.App. 1986) (concluding that testimony of psychologist about behavioral patterns of child incest victims and testimony of sociologist that victim fit these patterns was admissible in child abuse case). Thus, expert psychological and psychiatric testimony may be admissible in a variety of contexts.

■ Though the testimony here can be distinguished from impermissible profiling, courts must guard against improper admission of social science or experience-based expert testimony when it is not logically relevant, CRE 402, or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." CRE 403. *See Salcedo v. People, supra.* Thus, though we conclude that the testimony here is not profile evidence, we must nevertheless analyze it under *Salcedo* because of the general applicability of the test stated therein.

Here, the foundation for the prosecution expert's testimony established that the traits that characterize the perpetrator of a sexual homicide are based upon recognized studies conducted by professionals in the field. The record also adequately supports the expert's opinion that the violent sexual fantasies and triggering mechanisms that characterize perpetrators of sexual homicide are distinctive. Thus, the expert's testimony was logi-

cally relevant to the jury's general understanding of the crime and to comprehending defendant's motive and intent.

■ Though logically relevant, if the expert testimony poses an undue risk of prejudice, it is nevertheless inadmissible. *See* CRE 403; *Salcedo v. People, supra.* In *Salcedo,* the expert witness intermingled expert testimony concerning the behavior that characterizes a drug courier with eyewitness testimony concerning defendant's actions and appearance. This posed a risk of misleading the jury to believe that defendant had exhibited all of the characteristics in the profile or that all of defendant's behaviors could be found in the profile.

Here, the prosecution's expert kept his testimony regarding the characteristics of perpetrators of sexual homicides separate from his discussion of defendant's narratives and drawings. Thus, the risk of confusing the jury in this manner was low.

We conclude the prosecution expert's testimony was neither logically irrelevant nor unduly prejudicial, confusing, misleading, time-consuming, or cumulative under *Salcedo v. People, supra.* Therefore, we reject defendant's assertion.

### C.

■ Defendant also asserts that the trial court erred in allowing the prosecution expert to testify concerning how defendant's drawings and narratives fit a perpetrator of a sexual homicide because such testimony was only indicative of defendant's character. Again, we disagree.

Under CRE 703:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

An expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or

data, unless the court requires otherwise. The expert may be required to disclose the underlying facts or data on cross-examination. CRE 705.

██ Though the Colorado Rules of Evidence do not require an expert witness on direct examination to disclose the underlying facts that form the basis for his or her opinion, the rules do not prohibit an expert from doing so. *See Vialpando v. People,* 727 P.2d 1090 (Colo.1986); *see also* Fed.R.Evid. 705 (Advisory Committee Note).

Here, defendant's drawings and narratives were independently admitted into evidence before the prosecution's expert testified. Further, defendant does not contend that this evidence is not of a type reasonably relied upon by sexual homicide experts. Thus, it was proper for the expert to give his opinion on how this evidence related to a sexual homicide.

Moreover, even if evidence of defendant's drawings and narratives had not been independently admissible, the expert could testify as to how this evidence assisted him in forming his opinion. *See People v. Diefenderfer,* 784 P.2d 741 (Colo.1989); E. Imwinkelried, *supra,* § 1:14.

Consequently, we reject defendant's assertion that the trial court erred in allowing the expert to give his opinion on the relationship between defendant's drawings and narratives and sexual homicide.

To the extent defendant argues that the prosecution expert's testimony constitutes impermissible character evidence, we reject that contention for the reasons already stated.

Judgment affirmed.

MARQUEZ and TAUBMAN, JJ., concur.