**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

v.

**Jack SKINNER, Defendant–Appellant.**

No. 00CA0522.

Colorado Court of Appeals,
Div. V.

Jan. 3, 2002.

Certiorari Denied Aug. 26, 2002.

Ken Salazar, Attorney General, Roger G. Billotte, Assistant Attorney General, Denver, CO, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Joan E. Mounteer, Deputy State Public Defender, Denver, CO, for Defendant–Appellant.

Opinion by Judge KAPELKE.

Defendant, Jack Skinner, appeals from the judgment of conviction entered upon jury verdicts finding him guilty of attempted first degree murder, first degree assault, two counts of crime of violence, and two counts of being a habitual criminal. He also challenges the sentence imposed. We affirm.

Prior to trial, defendant filed motions seeking to exclude certain types of evidence. The first motion requested that a photograph of the tattoo on the back of his neck reading "DEATH TO NIGGERS" be excluded because such evidence was inflammatory and prejudicial. Further, defendant argued, it was irrelevant because he had not been charged with a hate crime or ethnic intimidation. The second motion sought to prohibit the prosecution from introducing any evidence of witness intimidation. The victim is an African–American.

At the hearing on the motions, defendant, who was a prison inmate at the time of the incident, asserted that the prosecution might attempt to introduce evidence of an "inmate code" to explain why the victim and another witness, who were also inmates, had changed their stories. Under the purported code, one inmate will not testify against another for fear of retaliation. Defendant asked the court to exclude such evidence absent specific evidence at trial that defendant had had something to do with the witnesses changing their accounts of the assault.

The prosecution argued first that the tattoo evidence should be admitted to show motive or intent for the assault and to establish the identity of the attacker. The prosecutor also argued that if any evidence were introduced concerning the existence of an inmate code, he should be allowed to pursue that line of questioning to impeach the credibility of the witnesses and provide an explanation for the victim changing his story.

At the conclusion of the hearing, the court denied the first motion, finding that the tattoo evidence was relevant to the issues of identity, motive, and intent. The court also found that the relevance and probative value of the tattoo evidence was not outweighed by its prejudicial effect.

As to the motion to exclude evidence of witness intimidation or the inmate code, the court found that the prosecution should not be limited in its ability to cross-examine witnesses. The court further found that the prosecution was not to introduce the topic of the "inmate code" or use that term. However, the court also ruled that if evidence were presented to support the existence of such a code, the prosecution could use the term in questioning the witnesses and in argument. Finally, the court ruled that unless specific evidence of witness tampering by defendant were introduced, the prosecution would not be allowed to refer to that subject.

During cross-examination of defendant at trial, the prosecutor questioned him about a tattoo depicting the Norse goddess Freya. Defendant denied it was a symbol of white supremacy and said it was a symbol of love and fertility. To rebut this explanation, the prosecutor, over defendant's objection, presented the testimony of an expert witness who opined that while the Freya tattoo could be considered a symbol of fertility, it also could be viewed as a symbol of a person's belief in the supremacy of the white race. Further, the expert stated his opinion that a person with tattoos such as defendant's would be likely to hold a white supremacist philosophy.

During the prosecution's case-in-chief, the court revisited the motion concerning the inmate code and found that specific reference had been made to such a code by a number of the witnesses. The court then allowed the prosecution to use the term and make further inquiry. However, the court found no evidence that defendant had intimidated any witness and therefore prohibited any mention or insinuation to that effect.

Defendant was convicted of the offenses charged and was sentenced to concurrent sentences of seventy-two years for attempted first degree murder and thirty-six years for first degree assault.

## I.

Defendant first contends that the trial court erred in admitting evidence of his tattoos. He further contends that the court improperly allowed evidence of an "inmate code." We perceive no abuse of discretion in the trial court's rulings.

Relevant evidence is evidence having any tendency to make the existence of any material fact more probable or less probable. CRE 401. Although relevant evidence generally is admissible, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. CRE 403.

The trial court has broad discretion in determining the admissibility of evidence and in weighing its probative value against its prejudicial effect under CRE 403. Absent an abuse of such discretion, the court's rulings will not be disturbed. The defendant seeking to show an abuse of discretion must show that the court's decision to admit or reject evidence was manifestly arbitrary, unreasonable, or unfair. *People v. Ibarra,* 849 P.2d 33 (Colo.1993); *People v. Eggert,* 923 P.2d 230 (Colo.App.1995).

Similarly, the trial court has broad discretion to determine the extent to which a proffered expert opinion would be helpful to the jury, and its decision whether to admit such testimony will not be overturned on appeal absent an abuse of discretion. *People v. Williams,* 790 P.2d 796 (Colo.1990).

On review, we must assume the maximum probative value that a reasonable factfinder might give to the evidence and the minimum unfair prejudice that might reasonably be expected. *People v. Gibbens,* 905 P.2d 604 (Colo.1995).

## A.

Defendant argues that the court erred in admitting evidence of the tattoo on his neck

to show identity, motive, or intent. We disagree.

Other courts have held evidence of racial prejudice admissible where it supplies a possible motive for the defendant's actions. *See O'Neal v. Delo,* 44 F.3d 655 (8th Cir.1995)(evidence of defendant's membership in racist organization admissible as probative of defendant's motive); *State v. Henke,* 954 S.W.2d 685 (Mo.Ct.App.1997)(defendant's use of derogatory racial term admissible to show motive for unprovoked assault); *State v. Novak,* 949 S.W.2d 168 (Mo.Ct.App.1997)(evidence of defendant's "white pride" tattoo admissible to show motive for murder). Further, evidence of tattoos can be relevant to the issue of identity. *State v. Kendrick,* 47 Wash.App. 620, 736 P.2d 1079 (1987)(evidence of tattoo depicting skull pierced with sharp object relevant to identity and motive in trial for murder where victims' heads similarly mutilated).

Here, the victim testified that, two days before the assault, he had confronted defendant about the offensive tattoo on his neck. Under the circumstances, evidence of defendant's tattoo was logically relevant to the issue of intent because it made it more probable that defendant possessed the intent to commit the assault than without such evidence. Further, it was relevant to the issue of motive, providing an explanation for defendant's actions.

We perceive no abuse of discretion in the trial court's finding that the probative value of the tattoo evidence was not substantially outweighed by its prejudicial effect. Defendant was able to explain the circumstances under which he got the tattoo and also to state that he was not proud of it and did not believe in its message. In addition, he testified that he had made inquiries about getting it removed but had been unable to afford the cost of doing so. Under these circumstances, the trial court did not abuse its discretion in admitting evidence of the tattoo on defendant's neck.

## B.

Defendant also argues that the trial court erred in admitting evidence of the

Norse goddess tattoo and in allowing an expert witness to testify about the significance of the tattoos. Defendant argues that the substance of the expert's testimony about the tattoos was so overwhelmingly prejudicial that it warrants reversal of his conviction. We disagree.

The expert witness did not offer an opinion as to whether defendant was a white supremacist or was likely to attack a person of a different race. *See People v. Masters,* 33 P.3d 1191 (Colo.App.2001) (upholding admission of expert witness testimony when, inter alia, expert did not opine on ultimate issue of whether defendant had committed the crime). Further, any prejudice resulting from the testimony was mitigated by the expert's own acknowledgment that the Norse goddess tattoo could have various meanings, including that described by defendant. We thus conclude that the trial court did not abuse its discretion.

### C.

We also disagree with defendant's contention that the trial court abused its discretion in admitting evidence of the existence of an "inmate code."

■ The prosecution sought to introduce evidence of an unwritten "inmate code" to explain why the victim changed his account of who had attacked him and why another inmate also had changed his story. The victim's first description of his attacker matched that of defendant. The victim then claimed he did not know who had attacked him. The victim later prepared and signed an affidavit stating he did not know who his attacker had been, but that it had not been defendant. At trial, however, the victim identified defendant as the person who had assaulted him.

The record supports the trial court's finding that evidence showing the existence of an inmate code had been brought out and supported by the witnesses' testimony. The victim testified, without objection, that he had filled out an affidavit recanting his earlier statement naming defendant as the person who had assaulted him because he feared the consequences if he "ratted" on defendant.

The prosecutor asked the victim, also without objection, what the word "snitch" meant to him, and he answered, "Death." The prosecutor then asked the victim if he was familiar with a convict code. The victim replied that inmates do not testify against other inmates for fear of physical attack.

The DOC chief investigator also testified without objection that it was common for inmates who were victims of attacks to withhold the attacker's identity or refuse to give information to investigators because of a "code of silence." However, he also stated during cross-examination that he was not aware of any evidence that defendant had threatened the victim.

The witnesses' testimony was sufficient to demonstrate the existence of an inmate code and to permit the prosecutor to use the term in his case and argument. Further, the prosecutor followed the court's instruction not to use the term "inmate code" until other evidence had been introduced to support the use of that term, and the prosecutor did not claim that defendant had intimidated any witnesses.

Such testimony was relevant to explain why the victim and other inmates had given conflicting statements as to who had committed the assault. We thus perceive no error in its admission. *Cf. People v. Hampton,* 746 P.2d 947 (Colo.1987)(allowing expert testimony on rape trauma syndrome to explain victim's delay in reporting); *People v. Lafferty,* 9 P.3d 1132 (Colo.App.1999)(allowing expert testimony regarding victim's recantations as part of "cycle of violence" associated with domestic violence).

### II.

■ Defendant also contends that the sentences imposed after the trial court adjudicated him a habitual criminal are illegal. Specifically, he argues that under § 16–13–103(4)(b), C.R.S.2001, he was deprived of his constitutional right to due process and trial by jury because the trial court, and not the jury, determined whether he was a habitual criminal. We do not agree.

Because this challenge to the constitutionality of Colorado's statutory scheme for adju-

dicating habitual criminality was not raised in the trial court, we decline to address it on appeal. *See People v. Lesney,* 855 P.2d 1364 (Colo.1993) (constitutionality of statute not raised before trial court and, therefore, not preserved for review); *People v. Boyd,* 30 P.3d 819 (Colo.App.2001)(challenge to constitutionality of statute cannot be raised for first time on appeal under constitutional plain error doctrine); *People v. Shepherd,* 43 P.3d 693 (Colo.App. 2001)(declining to address constitutionality of habitual criminal statute).

### III.

Finally, defendant contends that first degree assault is a lesser included offense of attempted first degree murder, that his convictions for attempted first degree murder and first degree assault merge, and that the conviction for first degree assault therefore must be vacated. We reject this contention.

 Although a defendant may be convicted of multiple offenses arising out of a single transaction, the defendant cannot be convicted of an offense that is a lesser included offense of another crime of which he or she is convicted. A lesser offense is included within a greater offense when the proof of the essential elements of the greater offense necessarily establishes all the elements required to prove the lesser offense. If a defendant is convicted of both a greater offense and a lesser included offense, the convictions "merge." Merger requires a comparison of the elements of the applicable statutes, not of the evidence presented on those elements. *People v. Rodriguez,* 914 P.2d 230 (Colo.1996); *People v. Webster,* 987 P.2d 836 (Colo.App.1998).

In *Webster,* a division of this court determined that first degree assault is not a lesser included offense of attempted first degree murder. The division reasoned that the crime of first degree assault requires proof that defendant either (1) inflicted serious bodily injury, either with a deadly weapon or under circumstances manifesting extreme indifference to human life, or (2) had the specific intent to disfigure the victim seriously

and permanently. *See* § 18–3–202(1), C.R.S. 2001. Because neither of these elements is an element of attempted first degree murder, the division concluded that first degree assault is not a lesser included offense of attempted first degree murder.

We agree with the reasoning in *Webster* and thus conclude that defendant's convictions for first degree assault and attempted first degree murder do not merge.

The judgment and sentence are affirmed.

Judge CASEBOLT and Judge VOGT, concur.